The Law Office of Ryan Lozar, P.C.
305 Broadway, 10th Floor, New York, NY 10007
Tel: (310) 867-1562; Alternate Tel: (646) 666-8262; Fax (877) 666-4456
ryanlozar@gmail.com
www.ryanlozar.com/www.luchaportusderechos.com



Dear Judge Kuo:

I am Plaintiff's counsel in Peeples v. City of NY, et al., No. 15 Civ. 6551 (JBW) (PK), which is a Section 1983 action.  Among other things, this litigation alleges that Defendants wrongfully arrested Ms. Peeples and six other non-party women based upon the false allegation that Defendants observed all seven women drinking in public from the same small bottle of liquor which Defendants unlawfully seized from within one of the non-party's purses without cause.  In part, Defendants have responded stating that even assuming, arguendo, that Ms. Peeples did not have an open container, Defendants had probable cause to arrest her because she was unlawfully in the park after dark.[1]  I write to provide the Court with Plaintiff's status report in advance of the July 27, 2016 telephone conference.  I have shared this status report with Defendants' counsel who has indicated that he will oppose certain items.  The Parties have conferred with respect to most all of the issues detailed in this letter either in conversation or through correspondence.  I apologize for the late filing of this status report.

I. **Parks Department Records And The Deposition Of A Parks Department Representative Pursuant To Federal Rule 30(b)(6)**

On May 11, 2016, after Defendants made their initial document production in this case, Plaintiff served a deficiency letter.  Exhibit B.  Among other things, Plaintiff requested that Defendants supplement their partial production of Parks Department Inspection Reports indicating whether and where signs regarding park hours were posted.  This is relevant information insofar as Defendants have placed the parks' hours at the heart of this case.  At this writing, Defendants have not produced those records.[2]

---

[1] The park in question is located at the foundation of the building where Ms. Peeples resides.  Exhibit A (Defendants' Exhibit 1 from Plaintiff's 7/26/2016 deposition, with Ms. Peeples' building marked in red and the park marked in green).

[2] At the same time that Defendants have failed to produce these records, I have produced to Defendants a Parks Department Web site indicating that the park is open twenty-four hours and I personally visited the park at issue and took photographs of multiple entrances completely devoid of any signage.  See, e.g., Exhibit C.

Relatedly, Plaintiff has noticed the deposition of a Parks Department representative pursuant to Federal Rule of Civil Procedure ("FRCP") 30(b)(6). Exhibit D.[3] Earlier today, Defense counsel indicated for the first time that Defendants may object. In the event that Defendants maintain this position, Plaintiff respectfully requests that the Court set a briefing schedule so that Plaintiff can move to compel Defendants to so produce.[4]

### II. The Identities Of The NYPD Officers On The Scene

In this case, Plaintiff has long maintained that nearly ten officers were on the scene during the incident. During the Court's May 12, 2016 conference with the Parties, I raised this issue with Defendants and the Court and the Court directed Defendants to produce the names of these seven unidentified officers to Plaintiff (the three named officers are named Defendants). Docket Entry 5/12/2016. Today, for the first, time, Defendants mentioned for the first time that they may take the position that only three officers were on the scene. While Defendants' claim is new, Plaintiffs' allegation to the contrary is longstanding and it has been corroborated for even longer by material in the case record. Not only did Plaintiff plead this allegation in the year 2015 and Defendants only contest it now, but in 2013, nearly three years ago, two of Plaintiff's co-arrestees testified to this same fact at 50-h proceedings. Exhibit E. Thus Plaintiff continues to request that these officers be named immediately. Defendants' delay has already harmed the truth-seeking function of pretrial practice by withholding this material information into the deposition phase of discovery. As before, Plaintiff maintains that these officers are at the very least non-party fact witnesses, but Plaintiff also previously argued that they may turn out to be appropriately named Defendants.[5]

It should also be noted that Defendants' own document production to date supports that there were more officers. As just one example of this, Defendant Ricciardi, who was partnered with Defendant Zidor, claimed to have transported three black females to the precinct in Van No. 9336. This is borne out by his Memo Book, Defendant Zidor's Memo Book, and the Command Log. Yet four other women were arrested and transported to the precinct as well. Someone had to have transported those four women, yet Ricciardi, Zidor and Friendly all arrived in one vehicle.

Defendants can find the answer to this question in any number of places. One suggestion which has been made to Defendants, for example, in Plaintiff's May 2016 deficiency letter and then again in Plaintiff's July 2016 letter which incorporated the May 2016 deficiency letter by reference and

---

[3] Also on July 11, 2016, Plaintiff served Defendants with another deficiency letter pointing out the unaddressed deficiencies from May 2016 and new ones as well. Exhibit F. In response, Defendants have produced Plaintiff's own criminal history and, earlier today, CCRB and IAB disciplinary summaries for Defendants.

[4] I will abstain from detailing Plaintiff's need for the 30(b)(6) witness here in case Defendants choose not to object, but the witness's relevance is explained in detail in Plaintiff's 30(b)(6) notice. Exhibit C.

[5] Defendants' stonewalling thus benefits the City in the event that one of the unnamed officers remains unnamed yet would otherwise be a proper Defendant.

as exhibit, is that Defendants produce APS (Auxiliary Police Section) datasheets, Sprint reports (Plaintiff testified that Defendants radioed for backup and two marked vehicles arrived on the scene such that the absence of these records are conspicuous), roll calls, roll call adjustment sheets, vehicle assignment sheets, recordings of radio transmissions, and more.

### III.   Defendant Officer Ricciardi's As-Yet Unconfirmed Deposition

As early as March 2016, I notified Defendants that I wished to depose Defendant Ricciardi (that notice admittedly did not propose a fixed date). On July 11, 2016, I suggested July 28, 2016, as the deposition date. Exhibit G. Defendants have demurred and despite further inquiry the proceeding is still not set. Given Officer Ricciardi's centrality to this case, his testimony may lead to other facts which Plaintiff is entitled to explore before fact discovery closes.

### IV.   Defendant Officer Ricciardi's Disciplinary Records Relating To Excessive Force And Abuse of Authority, And The Files Underlying All Defendants' Disciplinary Records

Earlier today, many months after Plaintiff executed a Protective Order to facilitate the production of Defendants' disciplinary records, Defendants released heavily redacted disciplinary resumes for the three named Defendants.

As a preliminary matter, Plaintiff disputes that the type of misconduct alleged in this action is limited to false arrest and false statements, which is how Defendants' production characterized the records it thought appropriate for Plaintiff's review. This action also alleges that one of Plaintiff's co-arrestees was unlawfully searched and the contraband allegedly found on her person imputed to Plaintiff. In the event that Defendants have a history of unlawful search of stopped persons, detainees and/or arrestees, this misconduct is also relevant to the instant action. In addition, Plaintiff's allegations include one against Defendant Ricciardi for unjustifiable force in the form of attempting to twist her cell phone out of her grip, hurting her in the process, and that this happened immediately upon Defendants' arrival on the scene and without any preamble. The operative pleading has not been amended to date to add this particular charge against Defendant Ricciardi, and I imagine Defendants would oppose it, but whether that allegation can be joined at this stage is irrelevant to Plaintiff's position that but for Defendant Ricciardi's misconduct in this regard, the situation would not have devolved into the unlawful mass arrest to subdue the alarmed group of seven women.[6]

---

[6] To be fair, it seems that Defendants have allowed some unlawful search and excessive force allegations to find their way into the summaries, but insofar as Defendants characterized their location of the produced documents as limited by a search for false arrest and false statements, Plaintiff would like to clarify that the proper scope of production cannot be so cabined.

Next, Plaintiff requested, but Defendants have not produced, the files underlying what Defendants have deemed to be the relevant disciplinary events.  These are often necessary to make even the slightest sense of the reported events.  For example, without the underlying file, a Defendants' so-called "procedural violation," without more, is information of little use.[7]

In light of Plaintiff's agreement to an extremely broad Protective Order—later entered by the Court—which was designed by Defendants themselves to insulate Defendants from any misuse of sensitive disciplinary information about them, I respectfully argue that I be permitted to explore the very material that Defendants asked me to legally bind myself to treat with kid gloves.  Unless Defendants can point to some history of mine in which I have acted imprudently with similarly sensitive information after signing the aforementioned agreement, which the Court so ordered, I fail to see the purpose of my promise to handle carefully material which is in any event almost completely suppressed.

Finally, Defendants have failed to produce a single document about the Defendant Officers' litigation history, despite the fact that PACER readily demonstrates that at least one of the parties has a breathtaking federal record in this regard, to say nothing of state lawsuits, notices of claims, etc.

V. **The Summons Relating To Ms. Peeples' Alleged July 2011 Summons And The Dispositions Relating To Ms. Peeples' Alleged July 2011 And Alleged August 2011 Summons**

Defendants claim that Ms. Peeples' false arrest damages are limited because she had two outstanding warrants which were discovered approximately two to three hours after the seizure and transport of the seven women without first examining any of their identification.  Yet Defendants have not produced the alleged summons underlying one of these warrants, or the dispositions for the alleged warrant charges.  This is a strange omission in light of the fact that Ms. Peeples was purportedly taken before a judge—unlike other arrestees who were released from the precinct—so that she could answer for the alleged warrant charges.  Plaintiff also requests the ADW records and NYPD agency equivalent records allegedly showing the warrants.[8]

---

[7] Defendants may say that Plaintiff can ask the Defendants about the underlying facts at deposition.  But at deposition, Plaintiff can only obtain the Defendants' own version of events.  In contrast, Defendants deposed Plaintiff at great length about her history, some of which is completely unrelated to this action in substance and time, and Defendants have access to many of those underlying files.  This creates a pronounced and unjust lack of parity in the record which hampers Plaintiff's ability to make her case as well as Defendants can defend against it.

[8] It should be noted that Ms. Peeples testified that she doesn't recall anything at all about one of the alleged summonses giving rise to one of the alleged warrants (this is the summons which Defendants have to date not produced), and that she barely recalls anything about the other one, which record is notable for the fact that it does not bear her signature acknowledging that it was ever given to her.   Defendants have produced records relating to

Page 4

In light of Plaintiff's allegation that it was Defendant Ricciardi's use of force against her in the first instance, and the other Defendants' indignation when Plaintiff and her co-arrestees objected, which caused all consequential constitutional violations, Defendants' response to Plaintiff's request for information regarding why <u>she</u> was treated differently than other arrestees as the night progressed is relevant.[9]

### VI.    Joanna Zeruti's Arrest Paperwork And Disposition (And Others', Where Available)

At least one of Plaintiff's co-arrestee's—Joanna Zeruti—was convicted of the open container offense.  Insofar as Plaintiff alleges that the alleged liquor bottle (Defendants did not preserve it as evidence, throwing what they claimed was a liquor bottle into the trash at the scene) was allegedly found when an NYPD officer rifled through Ms. Zeruti's purse, the content of Ms. Zeruti's paperwork is highly relevant to this action insofar as it contains Defendants' statements about the incident.  To date Defendants have not produced these records despite their being mentioned in Plaintiff's July 2016 deficiency letter.

                                                  Thank you,

                                                  *Ryan Lozar*

                                                  Ryan Lozar

Cc:   Alexander Noble, Esq., Defense Counsel (via ECF)

---

these matters which theoretically would show how a judge had disposed of them had a judge ever considered them, but these records are silent on that question.

[9] Plaintiff's closest friends Taniqua Harris and Tameka Jackson were also treated differently, and they were the women who protested more vociferously against Defendants unfair treatment of Ms. Peeples.  Plaintiff has little information about the purported basis for this differential treatment as well.