UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

KATRINA PEEPLES,                             :
                                             :
                              Plaintiff,     :
                                             :         PROPOSED SECOND AMENDED
              -against-                       :         COMPLAINT
                                             :         15cv6511 (JBW) (PK)
CITY OF NEW YORK, NYPD SERGEANT              :
DENNIS FRIENDLY, Shield No. 233, NYPD        :
OFFICER ANTHONY RICCIARDI, NYPD              :
OFFICER MIKELANG ZIDOR, Shield No.           :         Jury Trial Demanded
27521, NYPD OFFICER STAVROS, and NYPD        :
OFFICERS JOHN/JANE DOES 1-5,                 :
                                             :
                              Defendants.     :

-------------------------------------------------------- x

Plaintiff, KATRINA PEEPLES ("Ms. Peeples" or "Plaintiff"), complaining of Defendants,

respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.   Plaintiff KATRINA PEEPLES brings this action for compensatory damages, punitive

damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violation of Plaintiff's civil

rights, as said rights are secured by said statutes and the First, Fourth, Fifth, Sixth and Fourteenth

Amendments to the United States Constitution.

## JURISDICTION

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth,

Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

3.   Jurisdiction is found upon 28 U.S.C. §§ 1331, 1343.

## VENUE

4.   Venue is properly laid in the Eastern District of New York under 28 U.S.C. §

1391(b), in that it is the District in which the claim arose.

## JURY DEMAND

5.   Plaintiff respectfully demands a trial by jury of all issues in the matter pursuant to Federal Rule of Civil Procedure ("FRCP") 38(b).

## PARTIES

6.   Plaintiff is a resident of Queens County in the State of New York.

7.   Defendant CITY OF NEW YORK was an is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.   Defendant CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, City of New York.

9.   That at all times hereinafter mentioned, Defendant Sergeant DENNIS FRIENDLY, Defendant Officer ANTHONY RICCIARDI, Defendant Officer MIKELANG ZIDOR, Defendant Officer STAVROS, and JOHN/JANE DOES 1-5 were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

10. That at all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

11. Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting within the scope of their employment by Defendant CITY OF NEW YORK.

12. Each and all of the acts to be alleged herein were done by said individual Defendants while acting in furtherance of their employment by Defendant CITY OF NEW YORK.

## FACTS

2

13.     On the evening of Saturday, September 7, 2013, Plaintiff was near a bench on a baseball diamond with a group of six women friends, among them a friend named J.C.

14.     The baseball diamond was approximately 500 feet from Plaintiff's home.

15.     Individual Defendants approached Plaintiff and her friends without reasonable suspicion and demanded identification.

16.     Plaintiff and some of the other women asked Defendants' basis for asking for their identification, and one of the Defendants, on information and belief, Defendant Officer Ricciardi, responded by roughly pushing Plaintiff down to a seated position on the bench.

17.     Some of the women—among them Plaintiff's friends T.J. and T.H.—again asked about the perceived abuse of authority when Defendants had no reason to believe that the women were doing anything unlawful.  As the women asked this question of Defendants again and waited for the response, Plaintiff, now seated on the bench, looked at her telephone.

18.     Defendants refused to answer the womens' questions about why they sought the womens' identification and threatened to arrest the women if they failed to comply without questions.  Now Defendant Anthony Ricciardi turned his attention to Plaintiff, grabbed her wrist, and attempted to wrench her telephone from her hand, causing her pain and discomfort in the process.  Plaintiff had not done anything to justify this use of force against her and Defendant Ricciardi's action was not designed to achieve any legitimate law enforcement objective.

19.     Upon seeing Defendant Officer Ricciardi's treatment of Plaintiff, the other women—again including Plaintiff's friends T.J. and T.H.—protested at what they perceived to be an even worse abuse of authority, whereupon Defendants handcuffed all seven of the women (there is some confusion in the record as to whether Defendants handcuffed only six of the women or all seven—for the purposes of this pleading I will refer to seven arrestees and further discovery may clarify this fact).

3

20.     Defendants called for additional officers to come to the scene, which they did. Defendants and/or John/Jane Doe Defendant Officers transported the handcuffed women to the 114th Precinct.

21.     One of the Defendants searched J.C. without reasonable suspicion, probable cause or her consent.  Defendants claimed to find a very small bottle of alcohol in J.C.'s purse, opened it, and claimed to determine was alcohol.  This alleged closed small bottle of alcohol in J.C.'s purse became the basis for Defendants' arrest of all seven women, whom Defendants thereafter falsely stated were each witnessed in possession of an open container of alcohol.  In so falsely stating and/or failing to intervene to correct such false statements which, given the observable conditions at the baseball field and common sense were not plausible, Defendant Sergeant Friendly, Defendant Officer Ricciardi, Defendant Officer Zidor, and Defendants John/Jane Does 1-5, caused Plaintiff to suffer a violation of her rights.

22.     At the 114th Precinct, Defendants falsely stated that each of the seven arrestees possessed an open 375-ml bottle of alcohol as Defendants approached the scene.  This was not true.

23.     In particular, for the purposes of this action, it was not true that any Defendant saw Plaintiff holding an open bottle of alcohol yet Defendant Officer Ricciardi, with Defendant Sergeant Friendly's knowledge and approval, forwarded a false statement to that effect to the D.A.'s Office and, in reliance upon that false statement, the D.A's Office filed an open-container charge against Plaintiff.  Defendant Officer Zidor and Defendant John/Jane Doe Officers perpetuated such false statements by failing to intervene to correct them.

24.     In addition, the Desk Officer at the time of the mass arrest, whose name, on information and belief, is Defendant Officer Stavros (it is unclear whether this is his/her first or last name and his/her complete name is as yet unknown, but will be disclosed in further discovery), failed to intervene to correct the false and implausible statement that Defendants witnessed each one

4

of the seven women holding an open glass bottle of alcohol as Defendants approached them on the baseball diamond.  (Defendants claim to have left all bottles of alcohol on the baseball diamond.)  Stavros failed to intervene to correct other misstatements as well.

25.    On September 9, 2013, a state court judge dismissed the open container charges against Plaintiff and her friends.

26.    As a result of Defendants' unlawful conduct, Plaintiff suffered a deprivation of her liberty, damage to her reputation and emotional trauma.

27.    All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to a custom, policy and/or practice of: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

28.    The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  As a result, Defendant City of New York is aware (from said lawsuits as well as notices of claims and complaints filed with the NYPD's Internal Affairs Bureau and the CCRB) that many NYPD officers, including the Defendants, arrest individual persons in order to meet productivity goals and arrest quotas; arrest individuals for professional advancement, overtime compensation and/or other objectives outside the ends of justice; and/or falsely arrest individuals and engage in a practice of falsification

of evidence in an attempt to justify the false arrest.

29.     Defendant City of New York is thus aware that its improper training, discipline and customs and policies have often resulted in a deprivation of individuals' constitutional rights.  This failure caused Individual Defendants' violation of Plaintiff's constitutional rights.

30.     On information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants here lacked the objectivity, temperament, maturity, discretion and disposition to be employed as police officers.  In particular, here, at least one of the Individual Defendants has exhibited serious relevant misconduct in the past, yet the Defendant City retained the officer and allowed him continued contact with the general public, without first taking appropriate action through training, monitoring and/or discipline that would satisfy a reasonable observer.

31.     All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

32.     All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

33.     The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

34.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

35.     As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## SECTION 1983

36.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

37.     Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

38.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of her constitutional rights.

39.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
## FIRST AMENDMENT RETALIATION

40.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

41.     Defendants violated the First and Fourteenth Amendments because, in response to Plaintiff's good-faith and harmlessly-posed questions about Defendants' abuse of authority, Defendants arrested Plaintiff without cause.

42.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to castigate Plaintiff for asserting her rights and questioning Defendants' authority to deprive her of the same.

7

43. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
## FALSE ARREST

44. Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

45. Defendants violated the Fourth and Fourteenth Amendments because they detained and arrested Plaintiff without cause.

46. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of her constitutional rights.

47. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM
## FABRICATION OF EVIDENCE/FAIR TRIAL DEPRIVATION

48. Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

49. Defendants violated the Fourth, Fifth, Sixth and Fourteenth Amendments because they forwarded false statements and/or fabricated evidence about Plaintiff to prosecutors knowing that such false statements/fabricated evidence would be material to jurors and causing Plaintiff a deprivation of liberty as a consequence.

50. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of her constitutional rights.

51.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## EXCESSIVE FORCE

52.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

53.     Defendant Officer Ricciardi used excessive force against Plaintiff because, viewing the facts set forth herein, the circumstances did not warrant his use of force against her at all, the force he used against her was intentional and was meant to cause harm, and the force was objectively inappropriate and sufficiently serious.

54.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of her constitutional rights.

55.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SIXTH CLAIM
## FAILURE TO INTERVENE

56.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

57.     Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

58.     Accordingly, Individual Defendants who failed to intervene violated the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

59.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of her constitutional rights.

60.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

### SEVENTH CLAIM
### MONELL CLAIM

61.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

62.     The foregoing injuries and violations of Plaintiff's federal constitutional rights were directly, foreseeably, proximately, and substantially caused by conduct chargeable to the Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are allegedly investigated, arrested, or prosecuted for alleged criminal activities.

63.     The City is liable for the aforementioned injuries and violations because the City has failed to right the wrong in this case but, more importantly, it has created policies or customs which have created conditions and which perpetuate conditions under which unconstitutional practices regularly occur and even thrive; and has been indifferent, reckless and negligent in managing subordinates who cause the unlawful events.  The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct.

64.     The acts complained of were carried out by the Defendants in their capacities as police officers and officials pursuant to policies, procedures, regulations, practices, and customs implemented by the City and NYPD, and all under the supervision of ranking officers of the NYPD.

65.     Policymaking officials of the City and NYPD implemented plainly inadequate policies, procedures, regulations, practices, and customs, including but not limited to the following: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet "productivity goals"; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.  By failing to properly train, supervise and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

66.     At the time of the aforementioned constitutional violations, the City and NYPD had long been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part, infra, the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

67.     The City is on clear notice that its policies and customs have caused and continue to cause chronic constitutional violations.  This notice is evidenced by (1) the number of Civil Rights Lawsuits filed against it and its law enforcement officers (which, on information and belief, the City does not adequately track in order to identify problem precincts and/or problem officers), (2) the

11

number of Notices of Claim ("NOC") filed against the City and its law enforcement officers and the

City's inadequate responses to those NOCs, (3) the number of Complaints filed with the Civil

Complaint Review Board ("CCRB") against the City's law enforcement officers, (4) City Council

hearings, (5) newspaper reports, (6) criminal cases resulting in declined prosecutions and dismissals,

and (7) judicial rulings suppressing evidence and finding officers incredible as a matter of law.

Taken together, all of these red flags demonstrate that a troubling number of NYPD officers

unlawfully search and seize New Yorkers without probable cause, bring charges against New

Yorkers with no legal basis, perjure themselves in charging instruments and through testimony, use

excessive force against individuals, and fail to intervene in and report the obviously illegal actions of

their fellow officers, inter alia.

68.     For decades, the City has been on notice that certain precincts and certain police

officers are disproportionately responsible for civil rights lawsuit liability.  Nonetheless, the City has

failed to take action to track such information in order to hold precincts or officers accountable.

See, e.g., Wyatt v. Cole, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 lawsuits is to deter state

actors from using the badge of their authority to deprive individuals of their federally guaranteed

rights and to provide relief to victims if such deterrence fails.").

69.     One of the more recent examples of the City failing to make use of Civil Rights

Lawsuit data to improve law enforcement's record vis-à-vis the protection of individuals' rights

occurred in 2014 when the City Council considered whether the NYPD should have to produce

quarterly reports about complaints against the department.  Among other things, the reports would

indicate whether an officer who was the subject of a complaint had "previously been the subject of a

civil action or actions alleging police misconduct" so that tailored attention could be given to an

open and obvious existing and/or developing problem.  See Azi Paybarah, Council Seeks Regular

12

Reports On NYPD Complaints, May 5, 2014, at http://www.capitalnewyork.com/article/city-hall/2014/05/8544832/council-seeks-regular-reports-nypd-complaints (last accessed May 21, 2016).

70.     NYPD Commissioner Bill Bratton publicly opposed these reporting requirements. In June 2015, Commissioner Bratton stated that "[r]ather than enacting a set of reporting bills that impose information-sharing as a mandate, [the NYPD and the City Council] should sit down together and work out how relevant information may be shared, taking into account the manner in which the information is collected and maintained—and our available resources." See New York Police Department Commissioner William Bratton, Statement Before The New York City Council Public Safety Committee, June 30, 2015, at http://nypdnews.com/2015/06/police-commissioner-brattons-statement-before-the-new-york-city-council-public-safety-committee/ (last accessed May 21, 2016).

71.     The City's failure to compile and employ Civil Rights Lawsuit data in this manner is particularly shocking when one considers the trove of data that this represents.  For example, between 2009 and 2014, the City paid an average of $33,875 per case to resolve well over 10,000 cases.  See Caroline Bankoff, The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years, Oct. 12, 2014, available at: http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (last accessed May 26, 2016).  Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD has risen from $99 million to $217 million in between 2005 and 2014. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct.  See Office of the Comptroller, Claims Report: Fiscal Years 2013 and 2014, available at http://nylawyer.nylj.com/ adgifs/decisions15/083115claims.pdf.

13

72.     The City's opposition to or refusal to consider adopting more robust data collection, analysis and reporting practices, despite knowing those practices' benefits, has been longstanding.

73.     In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was a "total disconnect" between the settlement of civil claims—even substantial ones—and NYPD discipline of officers.  Hevesi continued that, as a result of this disconnect, the NYPD does not learn of potential problem officers and precincts, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City.

74.     In March 2000, the New York City Bar Association's Committee on New York City Legal Affairs made much the same observation.  After noting the large sums of money the City paid to settlement civil rights claims filed against it and its agents, the Committee lamented the fact that "there is no showing that either the police department or the City administration has made systematic use of the facts or results in such cases either in connection with the discipline of individual police officers or in the shaping of police department policy."  See The Association of the Bar of the City of New York Committee on New York City Affairs, The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change, March 2000, at http://www2.nycbar.org/ Publications/reports/show_html_new.php?rid=32#Ref3 (last accessed May 21, 2016).

75.     In 2009, the City Council noted that study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action, but again, this elicited no significant change in the City's methods.  See Christopher Dunn and Robert Perry, Reporting By The New York City Corporation Counsel On Civil Damage Claims Related To Police Misconduct, 2009, at

http://www.nyclu.org/content/reporting-new-york-city-corporation-counsel-civil-damage-claims-related-police-misconduct (last accessed May 26, 2016).

76.    By failing to keep track of crucial data, which could save lives as well as taxpayer money, the City has created a system in which lawsuits are treated as unrelated to their potential deterrent effect.

77.    The City is also on notice that it employs policies and practices which are presently insufficient to identify law enforcement's chronic violations of individuals' civil rights because recent Civil Rights Lawsuits and Criminal Prosecutions amply document systemic problems which the NYPD resists addressing, as evidenced by its opposition to reporting protocols and officer recidivism analyses.  By way of example,

a.    In Schoolcraft v. City of New York, 103 F. Supp. 3d 465 (S.D.N.Y. 2015), the Court found that evidence showed an issue of fact as to whether the City had a custom of retaliation against whistle blowers.  Among the record evidence was expert witness testimony about a "blue wall of silence," which is a "police culture that prizes intense loyalty, unity and solidarity among police officers to the extent that any officer reporting the wrongdoing of another officer would be in violation of the code and subject to retaliation." In addition, IAB-run focus groups had revealed that "physical fear surfaced several times [in participants] during the discussion on reporting corruption."

b.    In Colon v. City of New York, No. 09 Civ. 0008 (JBW), 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009), the Court denied the City's motion to dismiss the civil rights plaintiff's Monell claim against it for insufficient pleading, finding that:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of **repeated, widespread falsification by arresting police officers of the New York City Police Department**.  Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—**there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged**.

15

(emphasis added).  In response, NYPD Commissioner Raymond Kelly said that when this misconduct "happens, it's not for personal gain. It's more for convenience."  See Loren Yaniv and John Marzuli, Kelly Shrugs Off Judge Who Slammed Cops, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/ crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.

c.    In People v. Arbeeny, Index No. 6314-2008 (N.Y. Sup. Ct., Kings County), former undercover NYPD narcotics officer Steve Anderson testified about the frequency with which he observed a law enforcement officer planting narcotics on a suspect in order to make an arrest that would held the officer meet his or her monthly quota of arrests.  In order to achieve this, according to Anderson, an officer would carry a stash of narcotics to plant on innocent civilians, a practice that he called "attaching bodies."  According to Anderson,

> It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators.  Seeing it so much, it's almost like you have no emotion with it.  The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway.  That kind of came to me and I accepted it – being around so long, and being an undercover.

See, e.g., John Marzulli, We Fabricated Drug Charges Against Innocent People To Meet Arrest Quotas, Former Detective Testifies, Oct. 13, 2011, at http://www.nydailynews.com/crime/fabricated-drug-charges-innocent-people-meet-arrest-quotas-detective-testifies-article-1.963021 (last accessed May 26, 2016); Jim Dwyer, The Drugs?  They Came From The Police, Oct. 13, 2011, at http://www.nytimes.com/2011/10/14/nyregion/_those-drugs-they-came-from-the-police.html?_R=0 (last accessed May 26, 2016).

In response to the testimony, the presiding judge, New York Supreme Court Justice Gustin Reichbach stated

> Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.

d.    In People v. William Eiseman, Index No. 2999-2010 (N.Y. Sup. Ct., New York County), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, admitting to faking a marijuana case against one man and cocaine-related charges against another – and training subordinate officers to falsify paperwork to sidestep legal safeguards.  See, e.g., NYPD

Sgt. William Eiseman Pleads Guilty To Lying Under Oath In Plea Deal, New
York Daily News, June 27, 2011, at
http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-
pleads-guilty-lying-oath-plea-deal-article-1.129288 (last accessed May 26,
2016).

a.  In or around 2007, the United States Attorney's Office investigated the 109th precinct
    of the NYPD for "planting drugs on suspects and stealing cash during gambling
    raids."  The 109th precinct is believed to be involved in a practice known as "flaking"
    wherein police officers plant drugs on suspects in order to bring legitimacy to the
    arrest.  According to the Assistant United States Attorney Monica Evans, members
    of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this
    purpose."  John Marzulli, Claims of Corruption in Kings Precinct Put Crooked
    Cop's Sentencing on Hold, N.Y. Daily News, June 20, 2008, available at
    http://www.nydailynews.com/news/ crime/claims-corruption-Kings-precinct-put-
    crooked-sentencing-hold-article-1.296352 (last accessed May 26, 2016).

e.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was
    charged with perjury for claiming to have caught a burglar "red-handed"
    when, in fact, two other officers had made the arrest and handed the arrest
    off to Corniel.  In connection with the incident, it was revealed that as many
    as two dozen similar cases had come to light in the preceding year.

        That is a significant increase over previous years, sources said.
        "In the past, we'd find this happening once or twice a year, and
        now there are a bunch of them," said one law-enforcement
        official.

        What has authorities particularly troubled is that officers
        historically lied to cover up more serious corruption, such as the
        cadre of Brooklyn narcotics cops caught stealing drugs from
        dealers and masking their thievery by filing false reports about
        what they had seized.

    See Murray Weiss, NYPD In A Liar Storm, N.Y. Post, Oct. 26, 2009, at
    http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_
    qazMBEm3UNJVogv4Ndeqcl (last accessed May 26, 2016).

f.  In Bryant v. City of New York, Index No. 22011/2007 (N.Y. Sup. Ct., Kings
    County), a jury found that the NYPD had a policy "regarding the number of
    arrests officers were to make that violated [the] plaintiff's constitutional
    rights and contributed to her arrest."  See Oren Yaniv, Court Rules That
    Cops Do Use Quotas; Woman Injured In 2006 Arrest Settles For $75,000,
    New York Daily News, Feb. 19, 2011 (last accessed May 21, 2016).

g.  In MacNamara v. City of New York, No. 04 Civ. 7922 (RJS) (JCF)
    (S.D.N.Y), Docket No. 542, the Court granted the Plaintiffs' motion to
    approve a class-wide settlement reached in a case demonstrating evidence

that police officers systematically perjured themselves in sworn statements in order to justify the unlawful mass arrests of 1,800 demonstrators during the 2004 Republican National Convention.

h.  In <u>White-Ruiz  v. City of New York</u>, 983 F. Supp. 365, 380 (S.D.N.Y. 1997), the Court stated that it found the Mollen Commission's July 7, 1994 report investigating "Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department" to be "entirely reliable."  Among other things, the Mollen Commision reported that NYPD "[o]fficers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that they will be left alone on the streets in a time of crisis.  This draconian enforcement of the code of silence fuels corruption because it makes corrupt cops feel protected an invulnerable."

i.  In <u>Ariza  v. City of New York</u>, No. 93 Civ. 5287 (CPS), 1996 WL 118535, at *6 (E.D.N.Y. Mar. 7, 1996), the Court denied the defendants' summary judgment motion on the question of whether the City had a custom of retaliation against police corruption whistle blowers, stating that a reasonable jury could plausibly find that the plaintiff's evidence "establishes both a widespread usage and a failure to train in the police department."

78.    These cases are but a small drop in the ocean of Civil Rights Cases and Criminal Prosecutions which tend to reveal that the NYPD has been shown over and over to have a culture of unconstitutional customs and practices, **specifically with regard to the a culture of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, and covering for one's colleagues when they engage in this misconduct**, results in individuals suffering false arrest, false imprisonment, malicious prosecution, and other constitutional torts.

79.    It is thus manifestly clear through the litigation brought in federal and state courts in the City that even if the City was not the deliberate, malicious architect of polices and routinized conduct causing chronic violations of individuals' constitutional rights, it was certainly on notice of the practice.  By failing to take any meaningful corrective steps and instead choosing to put out fires whenever they break out (which is often), the City has ratified, endorsed, and otherwise communicated its acceptance of these policies and customs to the officers it employs.

80.     In addition, members of the NYPD are evaluated, at least in part, on the basis of their "productivity," which is measured by the number of arrests made, search warrants secured, and other, similar criteria.  Thus, members of the NYPD routinely make arrests and engage in other police activity without legal cause in order to raise their levels of "productivity" and improve the perception of their job performance.

81.     Under this policy or plan, officers are encouraged and pressured to make as many arrests as possible, which has caused and will continue to cause its officers, including the individual Defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges.  Accordingly, officers would have strong incentives to fabricate claims that the persons being arrested were engaging in criminal activity.  Certain examples of this were already discussed above in the context of, for example, flaking (planting narcotics on an individual in order to arrest).

82.     The existence of "productivity goals," which create incentives for NYPD members to engage in misconduct, is demonstrated by the following:

  a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[1]

  b.  An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts.

---

[1] Jim Hoffer, <u>NYPD Officer Claims Pressure To Make Arrests</u>, WABC TV Eyewitness News, March 2, 2010, available at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

"He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[2]

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month. Officer Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss; to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing.  You're going to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing till (sic) then."[3]

d.  The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" that they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[4]

e.  Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[5]

---

[2] Rocco Parascandola, NYPD Lt. Janice Williams Captured On Tape Pushing For More Busts But Brass Says There's No Quotas, N.Y. Daily News, March 3, 2011.

[3] See Hoffer, supra.

[4] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, available at http://www.nydailynews.com/new-york/cops-brooklyn-crime-ridden-77th-precinct-told-meet-quotas-moving-violations-memos-article-1.452621.

[5] Tom Namako, Nighttime Riders in Big Sit Fit, N.Y. Post. Dec. 26, 2009, available at http://nypost.com/2009/12/26/nighttime-riders-in-big-sit-fit/.

    f.   In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[6]

---

[6] Rocco Parascandola, Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas, N.Y. Daily News, Dec. 12, 2010, available at http://www.nydailynews.com/news/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648.

g.  The New York City Office of Collective Bargaining concluded that officers in
Brooklyn's 75th Precinct were required to issue four parking tickets, three moving
violation citations; three "quality-of-life" summonses, make one arrest and two stop-
and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD
maintained an illegal "summons quota for traffic violations in the precinct and by
penalizing officers for failing to meet the stated number of traffic citations." She
ordered the city to cease and desist from the practice. New York City Ticket Quota
Confirmed, Denied, The Newspaper.Com, January 21, 2006, available at
http://www.thenewspaper.com/news/09/914.asp.

h.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the
northern Bronx, was investigated for ordering officers to make a certain number of
arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton
> ordered at least eight members of an undercover anti-crime team
> to a meeting in Pelham Bay Park to berate them about an alleged
> lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to
> go our separate ways," Creighton told the officers, according to
> an internal complaint obtained by The News. Anything less than
> nine arrests would be a "personal slap in the face," Creighton
> allegedly said.
>
> Unbeknownst to Creighton, one officer had his NYPD radio
> switched on so the captain's 10 to 12 minute speech was
> broadcast to Bronx precincts in Morrisania and Schuylerville and
> taped by the 911 dispatcher.

See Allison Gendar, NYPD captain allegedly caught in arrest quota fixing, The New
York Daily News, November 14, 2007, available at
http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-
quota-fixing-article-1.256006.

83.    The existence of the aforesaid unconstitutional customs and practices, **specifically
with regard to the failure to supervise, train, instruct, and discipline police officers;
encouraging their misconduct; and exhibiting deliberate indifference towards the
constitutional rights of persons with whom officers come into contact** are further evidenced,
*inter alia*, by the following:

a.  In Floyd v. City of New York, 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013), the plaintiffs
brought a § 1983 action alleging that their Fourth and Fourteenth Amendment Rights
were violated when they were stopped pursuant to New York City's stop and frisk

policy. The court cited a 1999 investigation by the Attorney General finding that NYPD officers were conducting "unjustified stops and frisks" as evidence of the NYPD's awareness of its widespread violation of constitutional rights.[7] Despite this notice, the NYPD actually "[increased] its stop activity by roughly 700%" between 2002 and 2011 by "pressuring commanders … [who], in turn, pressured mid-level managers and line officers to increase stop activity by rewarding high stoppers and denigrating or punishing those with lower numbers of stops."[8] **In addition to noting several inadequacies in the NYPD training materials, the court found that "[t]he gravest problems in the NYPD's stop and frisk practices stem from … the 'operational policy' carried out in the streets"** wherein evidence of unconstitutional stops is denied as inaccurate and offending officers are not meaningfully disciplined or monitored to prevent future misconduct.[9] Indeed, the NYPD was found to be unable to correct unconstitutional practices or even identify constitutional violations.[10] Ultimately, the court found that the NYPD "violated § 1983 through their deliberate indifference to unconstitutional stops, frisks, and searches" and that "such stops [established] Monell liability based on 'practices so persistent and widespread as to practically have the force of law.'"[11]

b.  With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[12] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.  Justice Scheindlin further found that "the evidence of numerous unlawful stops at the hearing strengthens the conclusion that the NYPD's inaccurate training has taught officers the following lessons: stop and question first, develop reasonable suspicion later."[13]

c.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to

---

[7] <u>Floyd</u>, 2013 WL 4046209, at *24. See also The New York City Police Department's Stop & Frisk Practices (1999) (available at http://128.121.13.244/awweb/main.jsp?flag=browse&smd=1&awdid=1).

[8] <u>Floyd</u>, 2013 WL 4046209, at *24, 26.

[9] <u>Id</u>. at *40, 43 (emphasis added).

[10] <u>Id</u>. at *40.

[11] <u>Id</u>. at *70-71.

[12] <u>Id</u>. at *34.

[13] <u>Id</u>. at 131.

collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[14]

d.  Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

e.  In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 IAB investigations, and was the subject of at least 30 complaints filed with the CCRB. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to IAB charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.[15]

---

[14] Mollen Commission Report, pp. 2-3, available at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[15] Rocco Parascandola et al, Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements, N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.

    f.   Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the CCRB is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[16]  Since 2005, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[17]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[18]

84.    Rather than take meaningful steps to reduce and eliminate misconduct by its officers, the City and NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union leaders. The City's stated response to the wave of litigation caused by

---

[16] In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.   Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

[17] Christine Hauser, Few Results for Reports of Police Misconduct, New York Times, October 5, 2009 at A19.

[18] Christopher Dunn & Donna Lieberman, City Leaders Must Get Serious About Policing the Police, Daily News, August 20, 2008.

misconduct on the part of the NYPD is thus directed not at the deliberate and frequent

constitutional violations underlying the consequential litigation, but rather at defending such

misconduct so that officers can continue to engage in unconstitutional conduct without fear of

being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that

such misconduct is not sanctioned, ratified, or otherwise endorsed by the City and NYPD's

executive leaders and supervisory personnel.

85.     The City is liable to Plaintiff for its failure to keep track of judicial decisions in

suppression hearings.  Suppression hearings are a common context in which police officers' reveal

themselves to have fabricated testimony, and this provides a ripe opportunity for the collection of

data that would permit the City to target problem officers and precincts for discipline and training.

86.     There are hundreds of published decisions from the past several years in which

judges in New York City courtrooms determine that, as a matter of law, police officers have testified

incredibly, conducted illegal searches and seizures, and even suborned perjury.

87.     Judicial decisions from suppression hearings and trials are particularly reliable

indicators of a police officer's professional conduct and credibility because the testimony has been

tested in open court, under oath.

88.     Yet those in a position of authority—such as City policymakers, NYPD supervisors

and prosecutors—have devised no procedure by which an adverse judicial finding as to an individual

officer's testimony is communicated to that officer, his/her supervisor, or an oversight body.

89.     Without any notification, improper search and seizure practices and incredible

testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored,

and repeated misconduct by individual officers goes unaccounted for.

90.     This has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.

91.     The City is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such officers from any sense that they might ever be held accountable for the misconduct they commit.[19]  The effect—yet again—is that civil rights lawsuits do not serve a deterrent purpose.  "It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability."  Carlson v. Green, 446 U.S. 14, 21 (1980).

92.     The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.  The City has purported to attempt to address police officers' abuse of authority, in part through the creation and operation of the CCRB, a police oversight agency with investigative powers.

93.     However, the CCRB has proved inadequate.

94.     First, the CCRB's very structure belies its supposed goal of holding police officers accountable for their misconduct because it often finds that a complainant "lacks credibility" based on the fact that the complainant has also brought a civil rights lawsuit.  The result is that the CCRB often fails to substantiate some of the most serious allegations.

95.     Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those

---

[19] See Eric Jaffe, When Cops Violate Civil Rights, It's City Taxpayers Who Pay, CITYLAB, Dec. 4, 2014, at http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (last accessed May 21, 2016).

dishonest officers.  The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

96.     Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers.  Even when the CCRB substantiates complaints, the police department rarely imparts its own discipline on the officer, and often simply drops the complaints.[20]

97.     Fourth, the NYPD Department Advocate, endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized.  In the rare event that the CCRB substantiates a complaint and the NYPD Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner has employed.

98.     The complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

99.     Due to the failures of the CCRB, many abuses of authority by police officers go unreported.  Officers are thus free to abuse their authority with little or no fear of repercussions.

---

[20] See Nathan Tempey, CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force, www.gothamist.com, July 28,  2015 at http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 102 officers in that same period, only 22 of which faced administrative charges) (last accessed May 21, 2016); Police Punishment: CCRB v. NYPD, www.project.wnyc.org/ccrb/ (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

100.     Here, the lack of accountability contributed to the defendant police officers' actions described herein in that the Defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiff.

101.     The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and the NYPD Commissioner who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the IAB, and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers  for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

102.     All of the foregoing acts by defendants deprived Plaintiff of his federally protected rights, including, but limited to, the constitutional rights enumerated herein.

103.     Defendant City knew or should have known that the acts alleged herein would deprive Plaintiff of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

104.     Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and

because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

105.    Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including the NYPD Commissioner, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

106.    The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest Plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiff's constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of Plaintiff's rights.

107.    Plaintiff's injuries were a direct and proximate result of the Defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the Defendant City and the NYPD to properly supervise, train and discipline their police officers.

108.    As a result of the foregoing, Plaintiff was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

109.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

110.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiffs' rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

111.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

112.    The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

113.    The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as described herein.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully request the following relief:

A. An order entering judgment for Plaintiff against Defendants on each of their claims for relief;

B. Awards to Plaintiff for compensatory damages against all Defendants, jointly and severally, for their violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendment rights of Plaintiff, the amount to be determined at jury trial, which Plaintiff respectfully demands pursuant to FRCP 38;

C. Awards to Plaintiff of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiff, the amount to be determined at jury trial, which Plaintiff respectfully demands pursuant to FRCP 38;

D. Awards to Plaintiff of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:      September 6, 2016
            New York, New York

_____/s_____

Ryan Lozar (RL 0229)
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562
ryanlozar@gmail.com

*Attorney for Plaintiff*